

**Signed January 13, 2017.**

```
                         _____
                              Ronald B. King
                         Chief United States Bankruptcy Judge
```

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| JORGE QUIROZ HERNANDEZ, | § | CASE NO. 15-50173-RBK |
| | § | |
| DEBTOR. | § | CHAPTER 7 |
| _____ | § | |
| | § | |
| MAGDALENA LOPEZ, | § | |
| | § | |
| PLAINTIFF, | § | |
| VS. | § | ADVERSARY NO. 15-5028-RBK |
| | § | CONSOLIDATED WITH |
| JORGE QUIROZ HERNANDEZ, | § | ADVERSARY NO. 16-5004-RBK |
| ALEJANDRO QUIROZ-PEDRAZZI, | § | |
| GLOBAL Q INVESTMENTS, LLC, AND | § | |
| GRUPO 2+2, LLC, | § | |
| | § | |
| DEFENDANTS. | § | |

**OPINION**

In this adversary proceeding, Plaintiff, Magdalena Lopez ("Magdalena"), alleged that the Defendants, Jorge Quiroz Hernandez ("Jorge") and Alejandro Quiroz-Pedrazzi ("Alejandro"), fraudulently induced her to enter into a frozen yogurt venture that ultimately failed and caused her to lose approximately $671,270.00. After Magdalena filed a state court lawsuit against Jorge, he filed a Chapter 7 petition that stayed the lawsuit. Magdalena then initiated this adversary

proceeding to determine that her claim is nondischargeable under § 523(a)(2) or (a)(4) and to deny Jorge a discharge under § 727(a)(3). The Court concludes that $271,270.00 is nondischargeable under § 523(a)(4), but all other requested relief will be denied.

## I. Jurisdiction

"[D]eterminations as to the dischargeability of particular debts" and "objections to discharges" are core proceedings. 28 U.S.C. § 157(b)(2)(I), (J) (2016). The Court has jurisdiction to hear and determine these proceedings pursuant to 28 U.S.C. §§ 157 and 1334.

The state-law causes of action against Alejandro, Global Q Investments, LLC ("Global Q"), and Grupo 2+2, LLC ("Grupo"), are non-core proceedings, but the parties "agreed to the entry of a final order or judgment by the Bankruptcy Judge." *See* Adversary No. 16-5004-rbk, Agreed Notice of Removal of State Court Proceeding (ECF No. 1). With consent, the Court may hear and determine non-core proceedings if there is jurisdiction to do so. *See* 28 U.S.C. § 157(c)(2); ***Wellness Int'l Network, Ltd. v. Sharif***, 135 S. Ct. 1932, 1939 (2015).

Unlike consent to entry of final orders, however, subject-matter jurisdiction may not be conferred by consent of the parties. ***Gonzalez v. Thaler***, 132 S. Ct. 641, 648 (2012). The Court does not have subject-matter jurisdiction of the claims against defendants other than Jorge because the claims are between non-debtor parties and are not related to the bankruptcy case. *See* ***Galaz v. Galaz (In re Galaz)***, 765 F.3d 426, 431 (5th Cir. 2014). Therefore, the claims against Alejandro, Global Q, and Grupo must be dismissed.

## II. Factual Background

### A. Starting the OrangeCup Business: 2009–2011.

#### 1. Mexico OrangeCups.

In 2009 and 2010, Jorge and Alejandro opened three OrangeCup frozen yogurt stores in Mexico. The first store opened in late 2009 and eventually closed in 2014. The second store opened

2

in early 2010 and closed in late 2010 due to an increase in crime near the store. The third store opened in 2010 and closed in late 2012.

### 2. United States OrangeCups.

In May 2011, Jorge and Alejandro formed Global Q, a Texas LLC, for the purpose of purchasing OrangeCup stores in the United States. In July 2011, Global Q entered into a business transaction with an OrangeCup operator in Texas to purchase its intellectual property rights for $25,000 and tangible assets from three stores, including machinery, equipment, and other property, for $54,000.[1]

Four months later, in August 2011, Jorge and Alejandro formed San Antonio Orange Cup, LLC ("SA OrangeCup"), a Texas LLC, to open OrangeCup stores in San Antonio. In September 2011, SA OrangeCup signed a lease for its first store. In October 2011, Global Q signed a lease to open its second store.[2] During this time, Jorge also searched for a location to open a third store.

### 3. The Business Plan.

In late 2011, Jorge and Alejandro hired an independent third-party financial advisor to prepare a business plan for the new OrangeCup stores owned by Global Q. The plan based its projections from the Mexico and Texas OrangeCup stores, and initially envisioned opening three locations and two more stores shortly thereafter, all in San Antonio. The business plan contained pro forma profit and loss, cash flow, and balance sheet tables, with projections for five stores over the course of five years. The financial advisor listed $1,183,600 as "Paid-in Capital" or "Planned Investment." This amount was based on the fair market value of the capital for five stores, which included equipment, inventory, intellectual property, and cash investment.

---

[1] The purchased assets were from OrangeCup stores at North Star Mall in San Antonio, the Domain in Austin, and Deer Park in Houston.

[2] Due to certain lease requirements, Jorge and Alejandro decided that Global Q would enter into the La Cantera lease rather than SA OrangeCup.

**B.      Jorge and Magdalena's Business Relationship: 2012.**

Jorge and Magdalena met for the first time in May 2012.[3] Their first conversation lasted ten to fifteen minutes. They discussed OrangeCup, swapped business cards, and planned to meet again. Over the next several weeks, Jorge and Magdalena continued to meet. Magdalena sampled the frozen yogurt, viewed the machinery and equipment for the stores, and after she showed interest in investing, she was given a copy of the business plan.

Magdalena reviewed the plan and had many questions about the stores' finances. She inquired into the salaries of the staff; what represented the $1,183,600 in "equity capital"; and the status of the stores in Mexico among other inquiries. At their next meeting, Jorge explained that he would receive a monthly salary of $9,000 and the regional manager would receive a monthly salary of $5,000. With respect to the $1,183,600 in equity capital, Jorge explained that this amount represented not only cash investment, but it also included the intellectual property and equipment for five stores. They also discussed the two stores that were open in Mexico and the one that had closed for security reasons in Monterrey.

After Magdalena and Jorge further discussed the investment in the United States OrangeCup, Jorge offered Magdalena 20% of Global Q for $400,000. This figure was proposed because Jorge and Alejandro believed that Global Q's OrangeCup business had a value of approximately $2,000,000 based on the past performance of OrangeCup stores in Texas and their stores in Mexico. Before Magdalena accepted, she asked Jorge to provide financial documentation for Global Q and SA OrangeCup so that she could evaluate the condition of the companies. Both Magdalena and Jorge contacted their lawyers to prepare a subscription agreement by which

---

[3] Both Magdalena and Jorge are educated in financial matters and have a level of business sophistication. While in Mexico, Magdalena graduated from business school, worked at a bank as a loan officer, started several businesses, and was appointed to the board of a Mexican corporation. Jorge holds a law degree in Mexico, practiced corporate law for several years, and took some finance and accounting classes before ultimately entering into a business with his father to open OrangeCup stores in Mexico.

Magdalena would purchase 20% of Global Q for $400,000. Additionally, the lawyers suggested that Jorge form a holding company to hold certain OrangeCup assets and subsidiaries.[4] Following his lawyer's advice, Jorge created Grupo.

### C. The Subscription Agreement: July-August 2012.

On July 3, 2012, Magdalena, Jorge, and Alejandro signed the subscription agreement (the "Agreement").[5] The Agreement provided that Magdalena would contribute $400,000 to Global Q, and in return Global Q would "issue and deliver" to Magdalena a membership interest certificate representing 20% of the total membership interests in Global Q. The Agreement provided that Magdalena would lend Global Q $200,000, in the form of a promissory note that would mature 45 days after signing the Agreement; however, Magdalena would have the option of contributing the $200,000 note to Global Q as part of the $400,000 contribution and paying the remaining $200,000 in cash. Notably, the Agreement also provided that the financial information of Global Q and SA OrangeCup would be attached to the Agreement—but this document was never attached.[6] Magdalena signed the Agreement but did not receive the financial information. Nevertheless, as provided in the Agreement, Magdalena paid $200,000 and received a promissory note, which Grupo and Jorge, individually, guaranteed.

### D. Magdalena Continued to Inject Money: 2012–2013.

While she waited for the requested financial information, Magdalena deferred taking a written membership interest in Global Q. Magdalena remained persistent and continued to ask

---

[4] Prior to Magdalena's purchase, Grupo would own 100% of Global Q, and Global Q would own 100% of SA OrangeCup. Following Magdalena's purchase (including Global Q delivering to Magdalena her "membership interest certificate"), Grupo would own 80% of Global Q and Magdalena would own 20% of Global Q. Ultimately, Jorge and Alejandro never used Grupo as intended, and Grupo remained a shell company.

[5] Jorge signed individually, and on behalf of Global Q and Grupo.

[6] Whether Exhibit "C" was attached when Magdalena signed the Agreement is disputed. It appears to the Court that Exhibit "C" was not attached when Magdalena signed the Agreement.

Jorge for the records, while funding money to Global Q. Jorge unequivocally failed to provide the records.

Without the financial information, Magdalena continued to fund and receive promissory notes from Global Q, hoping that the stores would eventually turn a profit. All of these notes contained the same terms as the first and were guaranteed by Grupo and Jorge.[7] In sum, Magdalena made the following loans or contributions to Global Q:

| Date | Amount | Type |
|---|---|---|
| 07/03/12 | $200,000 | Promissory Note |
| 08/15/12 | $200,000 | Promissory Note |
| 10/02/12 | $100,000 | Promissory Note |
| 10/05/12 | $100,000 | Promissory Note |
| 02/05/13 | $15,000 | Cash Call[8] |
| 02/16/13 | $30,000 | Cash Call |
| 06/03/13 | $26,250 | Cash Call (does not include the $20.00 wire-transfer fee) |

**E. The Stores' Openings and Jorge's Failure to Produce the Requested Financial Information: 2012–2013.**

After the first store opened in late August, Magdalena, Jorge, and Alejandro held company meetings in which they discussed and made decisions regarding all aspects of the business.[9] On September 19, 2012, for the second time, Magdalena asked to see the financial information that should have been included with the Agreement, and to see the documents related to the purchase of the OrangeCup equipment and intellectual property. Once again, Jorge failed to provide any information. In fact, Jorge was unable to access the information because his accountant would not

---

[7] The promissory note from October 5 mistakenly stated the principal amount as $200,000; Magdalena's check to Global Q reflected the amount as $100,000.

[8] Alejandro and Jorge also advanced funds to Global Q for the cash calls.

[9] Meeting Minutes from September 19, 2012; October 29, 2012; January 24, 2013; January 30, 2013; and March 2, 2013 were admitted into evidence.

6

turn over the documents due to his failure to pay the accounting firm. In December 2012, the second store opened. In January 2013, for the third time, Magdalena asked to see the financial information of Global Q and SA OrangeCup, and to see the stores' expense data so she could better evaluate the cash flow and financials. Although the two stores already opened were not profitable, Magdalena and Jorge decided to open a third store in the summer of 2013, in a location Magdalena selected.

### F. The Stores Closed and Magdalena Filed Suit: 2013–2014.

The stores were not profitable and by June 2013 all three stores closed. On May 6, 2014, Magdalena filed suit against Jorge, Alejandro, Global Q, and Grupo in state court, alleging an assortment of causes of action under state law, including breach of contract, common law fraud, fraud by nondisclosure, statutory fraud, negligent misrepresentation, theft under the Theft Liability Act, violation of the Texas Securities Act, promissory estoppel as a claim, unjust enrichment, quantum merit, money had and received, conversion, vicarious liability by piercing the corporate veil, conspiracy, declaratory judgment action, and accounting. Before Magdalena filed suit, she did not demand repayment of the promissory notes with Global Q.

Jorge filed chapter 7 on January 16, 2015. Magdalena initiated the first adversary proceeding against Jorge, under §§ 523 and 727, on April 20, 2015. On January 14, 2016, Magdalena and the Defendants filed an Agreed Notice of Removal of the Bexar County lawsuit to this Court, which initiated a second adversary proceeding. The adversaries are now consolidated.

## III. Discussion

Magdalena initiated this adversary proceeding to determine whether her loss is a nondischargeable debt under § 523(a)(2) or (a)(4) and to deny the Debtor a discharge under § 727(a)(3). The Court concludes that $271,270.00 is nondischargeable only under § 523(a)(4).

7

### A. Magdalena Did Not Meet her Burden under § 523(a)(2).

After reviewing the evidence and evaluating the testimony of the witnesses at trial, the Court concludes that Jorge did not induce Magdalena to invest $671,250 in the OrangeCup business venture through false pretenses, false representations, or actual fraud under § 523(a)(2). While Jorge's business practices were imprudent, an irresponsible business person does not necessarily make a fraudster.

An individual debtor is not discharged from any debt:

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
    (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
    (B) use of a statement in writing—
        (i) that is materially false;
        (ii) respecting the debtor's or an insider's financial condition;
        (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
        (iv) that the debtor caused to be made or published with an intent to deceive . . . .

11 U.S.C. § 523(a)(2). A creditor must show by a preponderance of the evidence that a debt is nondischargeable under § 523. ***Grogan v. Garner***, 498 U.S. 279, 286 (1991). Additionally, in an action under § 523(a)(2)(A), "[e]xceptions to discharge are strictly construed against the creditor and liberally construed in favor of the debtor." ***FNFS, Ltd. v. Harwood (In re Harwood)***, 637 F.3d 615, 619 (5th Cir. 2011).

#### 1. Actual Fraud

In order to prevail in showing "actual fraud" under § 523(a)(2)(A), Magdalena must show that Jorge intended to deceive her. *See* ***Husky Int'l Elecs. v. Ritz***, 136 S. Ct. 1581, 1586–88 (2016) (explaining that "anything that counts as 'fraud' and is done with wrongful intent is 'actual fraud'").

The Court finds that Jorge did not intend to deceive Magdalena when he solicited her

8

investment. He was quite sanguine about the prospects for the business, and Magdalena shared his "terminal euphoria." Without showing an intent to deceive, Magdalena cannot prevail under the "actual fraud" prong of §§ 523(a)(2)(A) or 523(a)(2)(B).

**2. False Pretenses and False Representation**

In order for a debtor's representation to be a false representation or false pretense under § 523(a)(2), the representation "must have been: (1) a knowing and fraudulent falsehood, (2) describing past or current facts, (3) that was relied upon by the other party." ***Allison v. Roberts (In re Allison)***, 960 F.2d 481, 483 (5th Cir.1992); *accord **Jacobson v. Ormsby (In re Jacobson)***, No. 06-51460, 2007 WL 2141961, at *2 (5th Cir. July 26, 2007). Magdalena cannot prevail under § 523(a)(2)(A) because the Court finds that Jorge never made a knowing and fraudulent falsehood when soliciting Magdalena's investment.

Magdalena argued that Jorge made three false representations that induced her to contribute money to the business: 1) he represented that the stores in Mexico were successful when they had zero value; 2) he stated that the value of the OrangeCup business in the United States was $2,000,000; and 3) he represented that he and Alejandro had "paid in" $1,183,600 in capital when they had actually only contributed a fraction of that amount.

First, the Court finds that Jorge did not knowingly make false representations about the stores in Mexico when he solicited Magdalena's investment. Jorge testified that when he and Magdalena met, the first store in Mexico had been profitable—it was only later in the year that the store began to lose money, and the store did not close until 2014. Jorge also explained to Magdalena that the second store in Mexico closed for security reasons. Jorge testified that at the time he solicited Magdalena's investment he did not know whether the third store in Mexico was profitable because it was managed by other investors. The Court finds Jorge's testimony credible.

Second, the Court finds that Jorge did not knowingly make false representations about the

9

value of the OrangeCup business in the United States. Magdalena claims that Jorge told her that he had valued the business at $2,000,000 when he asked her to invest $400,000 for 20% of Global Q. Also, Magdalena claims that Jorge told her that he and Alejandro had invested $1,700,000 in the business. At trial, Jorge denied that he stated the value of the business was $2,000,000, or that he and Alejandro had invested $1,700,000, when he asked for Magdalena's investment. Jorge did testify, however, that he offered Magdalena 20% of the business for $400,000 based on the prior sales data from the Texas and Mexico stores, the money needed to open the new stores, and his optimistic outlook for the business. Jorge's offer reflected his belief that the business was worth at least $2,000,000. Even if Jorge had stated that he believed the business was worth $2,000,000, this did not constitute knowingly making a false representation under § 523(a)(2)(A). *See **Mozeika v. Townsley (In re Townsley)**,* 195 B.R. 54, 61 (Bankr. E.D. Tex. 1995) ("[A] mere expression of opinion, expectation or declaration of intention is not actionable under § 523(a)(2)(A).").

Finally, the Court finds that Jorge did not knowingly make false representations to Magdalena when he presented her with the business plan, which contained statements referencing $1,183,600 in "Paid-in Capital," "Planned Investment," or "equity capital." Jorge merely reiterated what the financial advisor had calculated. The advisor testified that the amount reflected in the business plan was not based on the initial cash investment that Jorge and Alejandro had made, but instead was based on the *fair market value* of the capital for five stores, which included equipment, inventory, intellectual property and cash investment, and the financial data from Jorge and Alejandro's OrangeCup stores in Mexico and the OrangeCup stores in Texas. The advisor testified that the numbers provided by Jorge "did not look inaccurate," and that there was "nothing inaccurate about the business plan." The Court finds the advisor's testimony and Jorge's testimony regarding the business plan credible.

The Court concludes that the projected financials referenced in the business plan, while overly optimistic, did not amount to false representations. *See id.* ("Representations of future profitability or client development, in the absence of proof that they were knowingly false, would not fall within the scope of § 523(a)(2)(A).").

**B.     Jorge Violated his Duty of Disclosure to Magdalena, and $271,270 is Therefore Nondischargeable under § 523(a)(4).**

The Court finds that Magdalena, Jorge, and Alejandro formed a de facto partnership on July 3, 2012 when they executed the Agreement and Magdalena lent Global Q $200,000. While Magdalena never formally became a member of Global Q, when they formed the partnership, Jorge owed Magdalena the associated duties of loyalty and care. The Court finds that Jorge's actions as a partner in the general partnership with Magdalena amount to defalcation in a fiduciary capacity.

**1. Establishment of the General Partnership.**

The first issue is whether a general partnership was created between Magdalena, Jorge and Alejandro. Magdalena never became a member of Global Q, but this does not change the fact that they had unwittingly formed a partnership by going into business together. Although Jorge, Alejandro, and Magdalena did not fully consummate the Agreement, the Court finds that the evidence and testimony presented at trial, including the Agreement itself, establish that they formed a partnership on July 3, 2012, when Magdalena signed the Agreement and lent Global Q $200,000.

Under Texas law, "an association of two or more persons to carry on a business for profit as owners creates a partnership, regardless of whether [] the persons intend to create a partnership . . . ." TEX. BUS. ORGS. CODE ANN. § 152.051. Section 152.052(a) of the Texas Business Organizations Code provides five factors to determine whether individuals have created a partnership:

  (1)  receipt or right to receive a share of profits of the business;
  (2)  expression of an intent to be partners in the business;
  (3)  participation or right to participate in control of the business;
  (4)  agreement to share or sharing:
     (A)  losses of the business; or
     (B)  liability for claims by third parties against the business; and
  (5)  agreement to contribute or contributing money or property to the business.

*Id.* § 152.052(a). Texas courts look at the totality of the circumstances when applying the factors to determine the existence of a partnership. *Ingram v. Deere*, 288 S.W.3d 886, 891 (Tex. 2009). None of the factors are required, controlling, or determinative for partnership formation. *Id.*

  Here, the circumstances establish that a partnership was established. First, Magdalena and Jorge intended to share profits. At trial Magdalena stated that she continued to fund Global Q because she believed that the business would eventually be profitable for her. The Court finds this testimony credible.

  Second, Magdalena and Jorge intended to, and did, become business partners. The evidence shows that when Magdalena signed the Agreement, she intended to be an investor, she was extremely optimistic about the future for the business, and she had an emotional attachment to it. Magdalena continued to inject money into Global Q so that it could move forward even after she failed to receive the requested records. Additionally, Magdalena referred to "our partnership" in an email to Jorge,[10] while Jorge referred in trial testimony to the "three owners," which included Magdalena.[11] The Court finds that these actions and the testimony of Magdalena establish that she intended to become a partner in the business.

  Third, Magdalena had the right to participate in control of the OrangeCup stores. Magdalena participated in company meetings with Jorge and Alejandro during which they discussed and made decisions regarding all aspects of the business.

---

[10] Defs.' Ex. 17 at 22.

[11] Quiroz-Hernandez Trial Test. at 1:52 p.m., June 17, 2016.

Fourth, the Court finds that Magdalena and Jorge agreed that Magdalena would contribute to the company. For a year, Jorge continued to accept Magdalena's contributions to the business—entering into seven transactions totaling over $671,270.00. Thus, the Court concludes that Magdalena, Jorge, and Alejandro formed a de facto partnership when they signed the Agreement on July 3, 2012.

### 2. Liability under § 523(a)(4).

The formation of their partnership created a fiduciary relationship between the partners, which included a duty of candor and *full disclosure* related to business. *See* **Hawthorne v. Guenther**, 917 S.W.2d 924, 934 (Tex. App.—Beaumont 1996, writ denied). This fiduciary relationship between partners in a general partnership is sufficient to trigger liability under § 523(a)(4). *See* **Schwager v. Fallas (In re Schwager)**, 121 F.3d 177, 186 (5th Cir. 1997); **Harwood**, 637 F.3d at 622. The Court finds that Jorge willfully neglected his duty to disclose business-related information to Magdalena, and a reasonable person in Jorge's position reasonably should have known to disclose such information. Magdalena lost $271,270 after Jorge neglected to disclose the requested information, and therefore, $271,270 is a nondischargeable debt.

"The scope of the concept of fiduciary under 11 U.S.C. § 523(a)(4) is a question of federal law; however, state law is important in determining whether or not a trust obligation exists." **Gupta v. E. Idaho Tumor Inst., Inc. (In re Gupta)**, 394 F.3d 347, 349–50 (5th Cir. 2004) (quoting **LSP Inv. P'ship v. Bennett (In re Bennett)**, 989 F.2d 779, 784 (5th Cir. 1993). In Texas, a partner in a partnership owes duties of loyalty and care and must discharge those duties in good faith. TEX. BUS. ORGS. CODE ANN. § 152.204 (West 2015). Included in a partner's duty of loyalty is a duty to account to the partnership for property and profits. *Id.* § 152.205. Further, in addition to the duties of "good faith and candor," partners owe one another "the general duty of *full disclosure* respecting matters affecting [a partner's] interests." **Hawthorne**, 917 S.W.2d at 934 (citing **Chien v. Chen**,

759 S.W.2d 484, 495 (Tex. App.—Austin 1988, no writ) (emphasis in original)).

An individual debtor is not discharged from any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4).

> "Defalcation" for the purposes of Section 523(a)(4) is a willful neglect of duty, even if not accompanied by fraud or embezzlement. Willful neglect does not require actual intent, as does fraud, and is essentially a recklessness standard. Willfulness in this context is measured objectively by reference to what a reasonable person in the debtor's position knew or reasonably should have known.

*Harwood*, 637 F.3d at 624 (internal citations and quotation marks omitted); *see also* **Bullock v. BankChampaign, N.A.**, 133 S. Ct. 1754, 1757 (2013) (holding that the state of mind required to show "defalcation" under § 523(a)(4) is "one involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior").

Thus, the Court concludes that Jorge violated his duty of disclosure to Magdalena and his actions amounted to "defalcation while acting in a fiduciary capacity." When Magdalena requested the financial information related to the business, and Jorge did not produce the documents or disclose the information within a reasonable time, he violated this duty. Consequently, the Court concludes that the money Magdalena lent or contributed to the business starting on October 2, 2012, totaling $271,270, is a nondischargeable debt under § 523(a)(4).

### C.    Magdalena Did Not Meet her Burden under § 727(a)(3).

Under § 727(a)(3), a debtor will not receive a discharge if the debtor "concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." 11 U.S.C. § 727(a)(3). The creditor has the initial burden to prove "(1) the debtor fail[ed] to keep or preserve financial records, and (2) the failure [made] it impossible for the creditor to discern the debtor's financial condition." ***Buescher v. First United***

*Bank & Trust (In re Buescher)*, 783 F.3d 302, 307 (5th Cir. 2015) (citing *Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 703 (5th Cir. 2003)). As with § 523(a) actions, the creditor must show by a preponderance of the evidence that the case falls within one of the § 727(a) exceptions. *Neary v. Jordan (In re Jordan)*, No. 05-86647, 2006 WL 3420143, at *6 (Bankr. N.D. Tex. Nov. 21, 2006) (citing *Grogan*, 498 U.S. at 286).

The Court finds that Jorge did not conceal, destroy, falsify, or otherwise fail to preserve his financial records in a way that made it impossible for Magdalena to discern his financial condition in the bankruptcy case. Jorge provided his tax returns, bank statements, credit card statements, and a voluminous amount of other financial records, both for himself and his businesses, which should have made it possible for Magdalena to discern his financial condition.

While Magdalena argued that Jorge failed to properly maintain books and records for the OrangeCup business as a basis for nondischargeability under § 523(a)(4), this is not necessarily a basis for denying Jorge a general discharge under § 727(a)(3).[12] Magdalena failed to show by a preponderance of the evidence that Jorge failed to keep or preserve financial records and, as a result, that it was *impossible* for her to discern his financial condition. Jorge will therefore receive a discharge under § 727.

### D. Among the Causes of Action under State Law, Jorge is Liable Only for Breach of Contract.

Magdalena originally filed suit against Jorge, Alejandro, Global Q, and Grupo in state court alleging various causes of action under state law, including breach of contract, common law fraud, fraud by nondisclosure, statutory fraud, negligent misrepresentation, theft under the Theft Liability

---

[12] The Court finds that, for the most part, Jorge kept records for the business, such as expense receipts, and he provided those records to the company's accountants to prepare financial statements for the business. While maintaining a "shoebox" record-keeping system is not ideal for maintaining books and records for a business, Jorge's system of maintaining books and records did not rise to the level of failing to keep or preserve financial records under § 727(a)(3).

Act, violation of the Texas Securities Act, promissory estoppel as a claim, unjust enrichment, quantum merit, money had and received, conversion, vicarious liability by piercing the corporate veil, conspiracy, declaratory judgment action, and accounting. The lawsuit was subsequently removed to this Court and consolidated with the adversary proceeding brought under §§ 523 and 727. At trial, Magdalena established that Jorge breached their contract, as a personal guarantor, to repay $600,000 for the promissory notes, but failed to show by a preponderance of the evidence that Jorge is liable under the remaining causes of action under state law.[13] As discussed above, Jorge had no intent to deceive Magdalena, and he made no material misrepresentations, when he solicited her investment in the OrangeCup business.

In Texas it is "well-established law that instruments pertaining to the same transaction may be read together to ascertain the parties' intent, even if the parties executed the instruments at different times and the instruments do not expressly refer to each other." *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000) (internal citations omitted). Additionally, the "court may determine, as a matter of law, that multiple documents comprise a written contract. In appropriate instances, courts may construe all the documents as if they were part of a single, unified instrument." *Id.* Further, if multiple agreements related to the same transaction are inconsistent, the court must ascertain the intent of the parties to determine whether a subsequent agreement rescinded the original agreement or whether the subsequent agreement "merely modifies the first agreement in some respect." *Texland Petroleum, L.P. v. Scythian,*

---

[13] Additionally, Magdalena relied on the testimony of Gary Ploetz to show that Jorge was liable under state law causes of action, and that he violated his fiduciary duty to her, by misappropriating company funds when he withdrew money from Global Q and SA OrangeCup bank accounts to pay off company expenses that he had charged to his personal credit card. As pointed out in Jorge's *Daubert* motion, Ploetz never asked Jorge about the transfers or how he reimbursed himself for company expenses. At trial, Jorge testified at length about how he kept receipts for company expenses, many of which were paid with his personal credit card, and how he reimbursed himself so that he could pay the portion of his credit card bills related to company expenses. Although the Court finds that Jorge's practice of paying and reimbursing himself for business expenses with his personal credit card was imprudent, after closely examining the receipts of company expenses, Jorge's credit card statements, and the bank statements he produced, the Court concludes that Jorge did not misappropriate money from the business for personal gain.

*LTD.*, No. 07–11–00141–CV, 2012 WL 1252967, at *2 (Tex. App.—Amarillo Apr. 13, 2012, no pet.) (citing *Willeke v. Bailey*, 189 S.W.2d 477, 479 (Tex. 1945)).

Here, the Agreement and the promissory notes are inconsistent as to whether Magdalena was investing in a membership interest or solely lending money to Global Q. Initially, Magdalena lent $200,000 to Global Q in the form of a promissory note, which matured in 45 days, in order to keep her options open. She had the right under the Agreement to contribute the note and an additional $200,000 to purchase a 20% membership interest. But Magdalena only lent money and paid cash calls to Global Q and never formally contributed the $400,000 for a 20% membership interest. Then throughout a year, Magdalena received three additional promissory notes to lend an additional $400,000 to Global Q, for a total of $600,000 in promissory notes guaranteed by Jorge.

Global Q breached its obligation under the four notes to repay a total of $600,000, plus interest, and as a personal guarantor of the loans, Jorge is therefore contractually liable for the failure to repay Magdalena. *See Austin Hardwoods, Inc. v. Vanden Berghe*, 917 S.W.2d 320, 323 (Tex. App.—El Paso 1995, writ denied). Although Jorge is liable for the failure to repay $600,000 to Magdalena, this debt is dischargeable.

### E. Magdalena Cannot Recover Attorneys' Fees Related to her Breach of Contract Claim or for a Finding of Nondischargeability under § 523(a)(4).

Even though section 38.001(8) of the Texas Civil Practice and Remedies Code provides that a party may recover reasonable attorneys' fees in an action to recover for breach of contract, her breach of contract claim is discharged. Thus, Magdalena cannot recover nondischargeable attorneys' fees related to her breach of contract claim.

In order to recover attorneys' fees under § 523, the fees must "(1) [be] allowed by statute or contract, *and* (2) arise from or [] on the account of the conduct that resulted in a nondischargeable debt." *Schwertner Backhoe Servs., Inc. v. Kirk (In re Kirk)*, 525 B.R. 325, 330

(Bankr. W.D. Tex. 2015) (Davis, J.) (explaining when attorneys' fees incurred in a § 523 action are recoverable and nondischargeable) (emphasis added); *see also* **Horton v. Robinson (*In re Horton*)**, No. 95-10023, 1996 WL 255304, at *5 (5th Cir. May 3, 1996). There is no statute or contract in this case that provides for recovery of attorneys' fees related to a finding of nondischargeability under § 523(a)(4). Thus, any attorneys' fees incurred by Magdalena are either not recoverable or are discharged in bankruptcy.

**IV. Conclusion**

When Magdalena, Jorge, and Alejandro agreed to go into the OrangeCup frozen-yogurt business together on July 3, 2012, even though Magdalena did not become a formal member of Global Q, they formed a de facto partnership, and the attendant fiduciary duties between partners arose. Jorge violated his fiduciary duty to Magdalena after he failed to disclose documents and other financial information related to the business. Thereafter, Magdalena lent or contributed approximately $271,270 to the business, which is a nondischargeable debt under § 523(a)(4). Although Jorge is also liable for an additional $400,000 in damages for breach of contract, this liability is discharged in bankruptcy. Additionally, all attorneys' fees are not recoverable or are discharged in bankruptcy. All other requested relief will be denied.

This opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Fed. R. Bankr. P. 7052. A separate judgment will be rendered.

###